## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY, a Nebraska Not for Profit Fraternal Benefit Society, | ) ) ) ) | Civil Case No. 8:09-cv-00407V |
| Plaintiff, | ) ) | AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |
| v. | ) ) | |
| U.S. BANK NATIONAL ASSOCIATION, | ) ) ) | |
| Defendant. | | |

COMES NOW Woodmen of the World Life Insurance Society a not for profit charitable insurance company ("Woodmen"), and, pursuant to F.R.C.P 15(1)(B), for its causes of action against U.S. Bank, N.A. ("U.S. Bank"), alleges, avers and states as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Woodmen of the World Life Insurance Society, is a not for profit fraternal benefit society incorporated in the State of Nebraska and licensed to do business in all fifty states of the United States, and existing for the mutual benefit of its 740,000 members and beneficiaries.  The purpose and objectives of Woodmen include fraternalism, the promotion of volunteerism, civic, charitable, and patriotic activities and the issuance of certificates for benefits, including policies of life insurance to its members. As an insurer, Woodmen is vitally affected with the public interest.

2. Defendant, U.S. Bank, N.A. is a National Bank Association with its principal place of business in Cincinnati, Ohio, and its main office in Minneapolis, Minnesota. FAF Advisors is a wholly-owned subsidiary and agent of U.S. Bank, N.A., and was

previously known as U.S. Bank Asset Management ("USBAM").   The actions of FAF Advisors and USBAM as alleged herein are imputed to U.S. Bank as agents for U.S. Bank.

3.   U.S. Bank conducts business in and has branch offices in the State of Nebraska, including the City of Omaha.  As used herein, and unless otherwise specified, any reference to "U.S. Bank" shall also include a reference to any agent(s) of U.S. Bank, such as, but not limited to, FAF Advisors and/or USBAM.

4.   Federal jurisdiction over this matter is proper pursuant to 28 U.S.C. § 1332, as Defendant is diverse from Plaintiff and the amount in controversy, excluding interest and costs, exceeds $75,000.00.

5.   Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) since defendant U.S. Bank does business in the State of Nebraska and is subject to personal jurisdiction in this judicial district.

## BACKGROUND AND GENERAL ALLEGATIONS

6.   This action arises out of the systematic, intentional and unlawful conduct of one of the largest banks in the United States, defendant U.S. Bank National Association.

7.   Woodmen brings this action to recover multi-million dollar losses Woodmen has sustained as a result of  U.S. Bank's securities lending and cash collateral investment program.   U.S. Bank trumpeted its securities lending program as a way for Woodmen to earn incrementally higher returns on securities Woodmen already owned.  U.S. Bank represented it would hold Woodmen's securities in U.S. Bank custodial accounts and, as Woodmen's agent and fiduciary, make temporary loans of Woodmen's securities to certain identified borrowers.  In exchange for the loan

of Woodmen's securities, U.S. Bank received cash collateral and the cash collateral was then to be invested by U.S. Bank in "conservative," safe and liquid investments. U.S. Bank repeatedly represented that its investments of Woodmen's cash collateral would be in high quality, liquid investments.

8.  Instead, U.S. Bank invested Woodmen's cash collateral into risky and illiquid securities which were backed by subprime and Alt-A mortgages.

9.  Even as U.S. Bank's own economist predicted a downturn in the U.S. economy and a "mild to deep recession," U.S. Bank continued to invest the cash collateral in these ill-advised, risky, illiquid and unsound securities.

10.  U.S. Bank covered up its grossly negligent and reckless conduct, as well its knowledge of the investments' deteriorating condition, until it was too late for Woodmen to exit the securities lending program without incurring substantial losses.

11.  Finally, in the summer of 2008, U.S. Bank informed Woodmen that these investments were in default and that the collateral of Woodmen was invested in commercial paper that was secured by securitized subprime and Alt –A mortgage bonds and advised Woodmen, for the first time, of the collapse of these investments. By that time, Woodmen had already suffered tens of millions of dollars in losses.

12.  To compound matters, U.S. Bank deliberately devalued shares in the Securities Lending Short Term Bond Portfolio (hereinafter referred to as "Securities Lending Portfolio") in an effort to entice securities lenders like Woodmen to remain in the securities lending program. This devaluation was presented to Securities Lending

Portfolio investors, including Woodmen, as a purported "benefit" to those investors who kept their assets in the Securities Lending Portfolio because the diminution in value was represented by U.S. Bank to be only temporary.

13.  U.S. Bank induced Woodmen to participate in the Securities Lending Portfolio pursuant to the contractual relationship by representing to Woodmen that U.S. Bank was actively involved in cash collateral investments, both at the time of purchase and continually throughout the duration of the investment.  This involvement purported to include selecting the investments, investigating the investments, monitoring the investments, and reporting on the investments.  In reality, U.S. Bank ineffectively attempted to transfer responsibility for management of the cash collateral investments to its agent and was doing very little, if anything, in this regard.  Nevertheless, U.S. Bank was receiving substantial income as if U.S. Bank was so acting.   As a result, U.S. Bank has been unjustly enriched.

14.  U.S. Bank failed to provide accurate, timely and *complete* information to Woodmen as to the value of Woodmen's investments and any data supplied to Woodmen by U.S. Bank failed to reflect actual values of investments.

15.  As a direct and proximate result of U.S. Bank's gross incompetence and gross negligence, its lack of due diligence, its willful misfeasance, and its grossly negligent and intentional misrepresentations to Woodmen, Woodmen has experienced losses approximating $29.7 million excluding interest.

<u>Securities Lending Generally</u>

16.  Securities lending is the market practice by which, for a fee, securities are transferred temporarily from one party (the lender), in this case Woodmen, to

another (the borrower), in this case third parties who received the securities. The
borrower is obligated to return the loaned securities either on demand by the lender
or at the end of an agreed term.

17.   The borrower is required to provide acceptable assets as collateral to the lender,
most often in the form of cash, known in this case as "cash collateral". Loaned
securities are required by insurance laws to be 'overcollateralized.' That is, the
value of the cash collateral must exceed the market value of the loaned securities.
The amount of cash collateral needed to secure a securities loan is subject to review
and must be increased if the value of the underlying loaned securities increases
throughout the duration of the loan. Legal title passes on both sides of the
transaction so that borrowed securities and collateral can be sold or loaned.

18.   Securities lending programs serve a dual purpose. First, they provide an
opportunity for the lender, in this case Woodmen, to earn additional income from its
securities. Lenders do so by having the cash collateral invested in conservative,
liquid, short-term investments. These short term investments are expected to earn
more interest income than the lower-than-market interest rates the lender pays to the
borrower (commonly referred to as the "rebate" rate) while the lender holds the
borrower's cash collateral.

19.   Second, securities lending programs provide a ready source of securities available
to those who need to borrow them for a short period of time, such as investment
banks and hedge funds.

20.   Although the borrower of the securities is legally entitled to any economic benefit
derived from its ownership of the loaned securities (i.e. dividends), most securities

lending agreements obligate the borrower to make equivalent payments back to the lender. Thus, in a typical securities lending transaction, the lender benefits from the income earned on its securities, as well as income it earns on its investment of the cash collateral, while the borrower benefits from the rebate and the temporary use of the securities.

21.    Securities lenders rely upon the liquidation of their cash collateral investments to repay cash collateral to securities borrowers. For this reason, any cash collateral investments must be adequately liquid and sufficiently conservative and secure so as to safeguard the principal. It is also for this reason that fiduciaries discharge their duties when investing cash collateral with the care, skill, prudence and diligence consistent with the fiduciary's reported "expertise."

22.    If the value of the lenders' cash collateral investments is less than the amount of cash collateral and interest that must be repaid to the borrower, the securities lender is left in a deficit position and must make up the balance from other revenue sources.

<u>The Woodmen-U.S. Bank Long Standing Relationship and Securities Lending Agreement</u>

23.    Since the early 1970's, U.S. Bank has served as nominee and custodian for Woodmen's publicly-held bonds and stocks. As part of this relationship, U.S. Bank would receive a percentage of the return of the invested collateral and, in effect, was receiving a return on Woodmen's securities.

24.    In or about 1997 Woodmen and U.S. Bank, through U.S. Bank's predecessor First Bank/First Trust, initially entered into a Securities Lending Agreement whereby

6

U.S. Bank provided securities lending and collateral investment services to Woodmen.

25. On March 31, 2006, U.S. Bank and Woodmen executed an "amended" and "restated" Securities Lending Agreement (hereinafter referred to as the "SLA")

26. U.S. Bank was the sole drafter of the SLA, which incorporated by reference the Offering Memoranda for two Selected Series, the Prime Portfolio and the Securities Lending Short Term Bond Fund ("Securities Lending Portfolio").

27. To induce Woodmen into signing the SLA, U.S. Bank represented to Woodmen that it had significant experience and "expertise" in investing securities lending cash collateral and that it would "actively" manage any investments of that cash collateral.  Woodmen reasonably relied upon these representations in executing the SLA.

28. In U.S. Bank's cover transmittal letter and attached "Q & A" memo, U.S. Bank misrepresented the amended and restated SLA as being 'standard in the industry' and designed to "correspond to, and take advantage of, the terms of the new standardized borrower agreements and to address current industry and regulatory issues pertaining to securities lending."  In fact, the SLA differed from both standard industry agreements as well as prior versions of the Securities Lending Agreement Woodmen had executed in the past with U.S. Bank and/or its predecessors.  Among the material differences was a provision which purported to prohibit U.S. Bank's liability to Woodmen.

29. Paragraph 10 of the SLA states as follows:

10. The Bank's Responsibilities.  The Bank's duties and responsibilities shall only be those expressly set forth in this Agreement.  Neither the

Bank nor its agents shall be responsible for any loss or liability arising from their performance of the Bank's duties under this agreement, except for direct loss or liability (but not consequential or punitive damages) arising from the Bank's, or its agent's, willful misfeasance, bad faith or gross negligence in the performance of the Bank's duties under this Agreement. In no event shall the Bank be liable for special, indirect or consequential damages, or lost profits or loss of business, arising under or in connection with this Agreement, even if previously informed of the possibility of such damages and regardless of the form of action.

30. Paragraph 10 of the SLA is void against public policy and unenforceable under both the laws of the State of Nebraska and the State of Minnesota in that: (1) said clause read literally precludes the recovery of specific damages regardless of the theory of recovery; or , in the alternative (2) is ambiguous in that meaning cannot otherwise be given to all terms therein contained. As a result, under one or either theory, the clause is unenforceable.

31. Paragraph 10 is susceptible to two or more reasonable meanings and therefore is ambiguous and must be construed against U.S. Bank.

32. Paragraph 10 is rendered null and void by U.S. Bank's fraudulent misrepresentation of the terms and conditions of the SLA.

33. The SLA contains a choice of law provision declaring that the SLA "shall be construed and enforced in accordance with the laws of the State of Minnesota without reference to its conflicts or choice of law principles."

34. Pursuant to the Nebraska Uniform Conflict of Laws Limitations Act, Neb. Rev. Stat. §§ 25-3201–3207, Minnesota's statutes of limitation govern all causes of action set forth herein.

35. Following execution of the SLA, U.S. Bank sent Woodmen monthly "statements" of its Securities Lending Portfolio investment. The statement consisted of nothing

more than an income earning statement reflecting how much income Woodmen and

U.S. Bank had each earned from Woodmen's cash collateral investments.  At no

time did U.S. Bank provide Woodmen with any information showing the value of

the Securities Lending Portfolio or how it was performing overall, but instead

Woodmen reasonably relied upon U.S. Bank's ongoing representations as to the

Securities Lending Portfolio's performance and U.S. Bank's general representations

that investments in U.S. Bank's securities lending cash collateral program were

conservative, "high quality" and low-risk.  Moreover, Woodmen had no means by

which to independently determine whether the Securities Lending Portfolio was

performing as expected or as previously represented by U.S. Bank, or to ascertain

the value of the Securities Lending Portfolio at any given time.   The collapse of the

values of the Securities Lending Portfolio were secretly and wrongfully withheld

from Woodmen by U.S. Bank in this manner until at least June of 2008 after which,

for the first time, detailed monthly statements of fund values were disclosed to

Woodmen.

36.     By failing to provide Woodmen with monthly statements which detailed the values

and performance of the assets held by the Securities Lending Portfolio investments,

U.S. Bank voluntarily assumed the duty to supervise the investments of Woodmen's

cash collateral above and beyond the supervisory duties imposed on it by the SLA

and Offering Memorandum.  However, U.S. Bank failed to perform either its

contractual or voluntary supervisory duties

Continued Representations of U.S. Bank

37.     Under the SLA, as Woodmen's securities custodian lending agent and fiduciary, ,

U.S. Bank loaned Woodmen's securities, which U.S. Bank held for Woodmen in

custodial accounts, to investment banks and/or brokers in return for cash collateral

equal to not less than one hundred two percent (102%) of the market value of the

lent securities.  U.S. Bank was then supposed to invest that collateral into certain

short-term instruments in accordance with its self-professed "risk-controlled" and

"conservative" investment policies.   U.S. Bank would and did share in the income

earned on the cash collateral securing Woodmen's loaned securities.

38.     Over the years, U.S. Bank continued to make representations with regard to the

financial security of U.S. Bank's securities lending and cash collateral investment

programs.  For example, U.S. Bank represented that securities lenders could

"generate additional revenue in a <u>risk-controlled environment</u>" and that U.S. Bank

would "work in a close partnership with you...."  Such a close working partnership

would afford the securities lender "the fiduciary **expertise** of U.S. Bank

Institutional Trust & Custody combined with the investment and risk management

**experience** of its agent, a registered investment advisor with more than $100 billion

in assets under management."

39.     U.S. Bank further characterized any risks associated with U.S. Bank's securities

lending program as being "strictly controlled" as a result of its "conservative

approach to risk management and our fiduciary responsibilities to you."  The

securities lending program was touted as one based upon an investment policy

establishing "strict quality guidelines for collateral investments."  All issuers were

to be pre-approved by U.S. Bank's agent, providing an additional layer of credit oversight.

40.     Each of the foregoing statements and representations were made by U.S. Bank with the expectation that prospective and existing securities lenders such as Woodmen would rely upon them and U.S. Bank when deciding whether to initiate or continue their participation in U.S. Bank's securities lending program.

41.      In exchange for providing fiduciary and investment "expertise," U.S. Bank earned twenty-five percent (25%) of all net income derived from the investment of Woodmen's cash collateral.  To date, upon information and belief, U.S. Bank has earned over $3,500,000.00 in such fees from Woodmen.

42.     In addition, U.S. Bank's agents earned a fee equal, on an annual basis, to 0.02% of the Securities Lending Portfolio's average daily net assets.  The value of Securities Lending Portfolio generally exceeded $1 billion, resulting in an annual income of $200,000.00 to U.S. Bank agents.

### U.S. Bank's Investment Portfolios

43.      Under the terms of the terms of the SLA and Offering Memorandum, Woodmen appointed U.S. Bank as Woodmen's agent and fiduciary for the purpose of lending Woodmen's securities and investing collateral and U.S. Bank agreed to act in such capacity for Woodmen.  In such capacity, U.S. Bank had exclusive and independent discretion in deciding how to invest Woodmen's cash collateral as to the funds offered to Woodmen by U.S. Bank.  Although U.S. Bank was authorized to retain its agent and wholly-owned subsidiary to provide investment advice, U.S. Bank had

a non-delegable duty to ensure that the investments of Woodmen's cash collateral were fundamentally safe, conservative and liquid.

44. Prior to 2005, U.S. Bank operated a commingled fund for cash collateral investments wherein each securities lender held a pro-rata share of the pool. In 2005, U.S. Bank changed this practice and required U.S. Bank's clients to select one of two institutional mutual funds for their cash collateral investments; clients were not allowed to allocate their cash collateral across both funds. Both funds were created, controlled and operated by U.S. Bank and its agents. The funds were available only to participants in U.S. Bank's securities lending program.

45. U.S. Bank represented to Woodmen that investments in the Securities Lending Portfolio would be high quality fixed income securities with short to medium term maturities. The Securities Lending Portfolio was designed to maintain a high level of liquidity to enable Woodmen to repay cash collateral to borrowers upon termination of the loans. Therefore, it was represented by U.S. Bank that the Securities Lending Portfolio's per share net asset value would not fluctuate significantly and that there would be sufficient liquidity in the Fund to allow Woodmen to repay all cash collateral at any point in time. U.S. Bank stated that shares in the Securities Lending Portfolio were available for redemption on each day the Federal Reserve Bank was open for business.

46. U.S. Bank prepared the Offering Memorandum for the Securities Lending Portfolio, which Woodmen reasonably relied upon when selecting the Securities Lending Portfolio. The Offering Memorandum failed to disclose the true risks Woodmen faced by selecting this series. In particular, although the Offering Memorandum

stated that Securities Lending Portfolio assets could be invested in asset-backed commercial paper and mortgage-backed securities, at no time did U.S. Bank inform Woodmen that the Securities Lending Portfolio would be investing in securities backed by subprime or Alt-A mortgage bonds.  Subprime and Alt-A mortgage bonds presented a greater risk of loss, which risk was and at all times would have been unacceptable to Woodmen.  Had U.S. Bank properly disclosed this risk, Woodmen would not have selected U.S. Bank or the Securities Lending Portfolio as its securities lending cash collateral investment vehicle.

47.    The Offering Memorandum also stated that shares in the Securities Lending Portfolio were available for redemption on each day the Federal Reserve Bank was open for business.

48.    At no time prior to July of 2008, and only *after* Woodmen signed a Confidentiality Agreement, did U.S. Bank inform Woodman that U.S. Bank and its agents had invested Securities Lending Portfolio assets into subprime or Alt-A mortgage-backed securities.

49.    Some time prior to August 2007, U.S. Bank invested Securities Lending Portfolio assets in commercial paper issued by three different entities:  KKR Atlantic Funding Trust ("KKR Atlantic"), KKR Pacific Funding Trust ("KKR Pacific"), and Ottimo Funding, Ltd. ("Ottimo Funding").  The precise date(s) of the investment(s) is/are not known to Woodmen.

50.    KKR Atlantic, KKR Pacific and Ottimo Funding are the kind of entities commonly referred to as Structured Investment Vehicles, or "SIVs."  These SIVs were issuers of Asset-Backed Commercial Paper.  SIVs were able to borrow in the commercial

13

paper markets and held assets backing their commercial paper program comprised of longer-term mortgage bonds.

51.   When deciding which SIVs to invest Woodmen's cash collateral in, U.S. Bank was simply "buying ratings". U.S. Bank failed to perform due diligence, including conducting a separate or independent investigation of the nature and quality of the assets backing the commercial paper issued by the SIVs.

52.   Unbeknownst to Woodmen, the commercial paper program into which the Securities Lending Portfolio invested was backed in part by Alt-A and subprime mortgage bonds.

53.   After the Securities Lending Portfolio invested hundreds of millions of dollars in commercial paper issued by these SIVs, analysts following these and similar SIVs warned that the lack of liquidity in the credit market and sharp declines in the market value of assets backing many SIVs threatened their viability.

54.   The analysts' projections ultimately proved true.  The values for subprime bonds fell sharply and the SIVs were unable to refinance or pay off their commercial paper borrowings.

55.   None of this was known to Woodmen and this was known or should have been known to U.S. Bank and its agents and was not provided to Woodmen by U.S. Bank or its agents.

KKR Atlantic's, KKR Pacific's and Ottimo Fundings' Downward Spirals

56.   Beginning in August 2007, investment rating agencies such as Standard & Poor's, Moody's Investor Services, and Fitch Ratings began to steadily downgrade the asset-backed commercial paper issued by KKR Atlantic, KKR Pacific and Ottimo

Funding.  By October 2, 2007, KKR Pacific had been downgraded from 'B' to 'D.' By October 29, 2007, KKR Atlantic had been downgraded to Not Prime, or "junk." And by November 9, 2007, Ottimo Funding's ratings was downgraded from 'C' to 'D.'

57.    None of the above developments, which were known or should have been known to U.S. Bank and its agents, were reported to Woodmen by US Bank with regard to their cash collateral investments.

58.    Notwithstanding these numerous warnings and downgrades, U.S. Bank and its agents failed to act reasonably and prudently.  Although U.S. Bank knew first-hand that the SIVs were experiencing financial difficulty and were in default, U.S. Bank continued to hold on to the investments and remained non-communicative with Woodmen in violation of its fiduciary duty to Woodmen.

59.    Only *after* the bottom fell out of these SIVs did U.S. Bank inform Woodmen that "[o]ver the course of the past year, each of the [SIVs] has experienced at least one default or deferral in payment of principal and/or interest. . ."  By then, it was too late for Woodmen to liquidate its cash collateral investment portfolio.

60.    At no time prior to July of 2008, and only *after* Woodmen was forced to sign a Confidentiality Agreement, did U.S. Bank inform Woodmen that U.S. Bank and its agents had invested the Securities Lending Portfolio assets into subprime or Alt A mortgage-backed securities, and at no time was Woodmen informed, despite U.S. Bank's knowledge to the contrary, that the value of Woodmen's Securities Lending Portfolio was then valued at less than par.

61.    As a result of the devaluation of the subprime bonds, U.S. Bank, without prior

notice to or the permission of Woodmen, granted several loan extensions to the

SIVs.

62.    In March of 2008, Robert Maher, Vice-President of Investment for Woodmen

contacted Emile Busse, the head of U.S. Bank's securities lending program.  Mr.

Maher inquired about the safety of Woodmen's cash collateral investments.

Although U.S. Bank knew at that time that one or more of the SIVs had defaulted

on the loans of the SIV's, Mr. Busse nevertheless represented to Woodmen that

Woodmen's cash collateral investments were sound.  Mr. Busse made such

representations when he either knew them to be false, or he made them in reckless

disregard of the true facts.  Only a few months later, U.S. Bank would perform an

about-face and take drastic measures to try and salvage what remained of the

Securities Lending Portfolio.

U.S. Bank Liquidates and Restructures the Securities Lending Portfolio

63.    In early June 2008, Mr. Busse contacted Mr. Maher and reported that board of the

Securities Lending Portfolio was considering splitting up the Securities Lending

Portfolio and that the value of the Securities Lending Portfolio would be marked at

ninety nine cents ($.99) on the dollar.  The alleged purpose of this mark down was

to ensure that securities lenders pulling out of the Securities Lending Portfolio

would not be advantaged by redeeming their shares at $1.00 each.

64.    Shortly thereafter, without approval of Woodmen, U.S. Bank liquidated the

Securities Lending Portfolio effective June 24, 2008, and restructured the assets of

the Securities Lending Portfolio.  On or about June 25, 2008, U.S. Bank sent a

notice ("Notice") to Woodmen advising Woodmen of the after-the-fact liquidation and restructuring.

65.   Although, in theory, Woodmen's securities loans were over-collateralized, the cushion of over-collateralization quickly evaporated and investors in the Securities Lending Portfolio, like Woodmen, have been left holding commercial paper backed by poorly-performing Alt-A and subprime mortgages.

66.   The most poorly-performing holdings – those of KKR Atlantic, KKR Pacific and Ottimo Funding (now known as "New Entity, LLC") – are presently being held in an illiquid, unredeemable trust. As a result, Woodmen lost the ability to withdraw or redeem Woodmen's investment in these holdings causing Woodmen damages and ever accumulating damages.

67.   Pursuant to the terms of the documents establishing the Liquidating Trusts established by U.S. and/or its agents, the powers of the Trustee to the Liquidating Trusts include the power to sell, convey and transfer Trust Assets of the Liquidating Trusts. As the entity authorizing the creation of the Liquidating Trusts, U.S. Bank must account for the assets held and/or disposed of by the Trust.

68.   Information regarding the assets held in the Liquidating Trusts is within the sole possession and control of U.S. Bank and its agents. The monthly statements sent to Woodmen provide no information regarding the underlying mortgages held in the trusts and, as a result, Woodmen is unable to fully determine the extent of its losses without an accounting of the same.

69.   To the extent the Liquidating Trusts have disposed of any Trust Assets for a loss, including but not limited to any commercial paper, mortgages and/or real property, Woodmen is entitled to an accounting of such sales or transfers.

70.   Presently, upon information and belief, the deficit between the market value cash collateral and the amount Woodmen owes to Woodmen's securities borrowers is approximately $29.7 million and constitutes Woodmen's actual compensatory damages due to the actions and liability of U.S. Bank and the agents of U.S. Bank.

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT

71.   Woodmen, for its First Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

72.   Woodmen seeks a declaratory judgment.  This instant litigation involves an actual controversy between the parties ripe for adjudication pursuant to 28 U.S.C. § 2201 *et seq*. and Nebraska Revised Statute Section § 25-21, 149, because it involves this Court's determination as to the ambiguity, validity, and enforceability of a provision in the SLA which purports to limit U.S. Bank's liability.

73.   U.S. Bank misrepresented the amended and restated SLA as being 'standard in the industry' and designed to "correspond to, and take advantage of, the terms of the new standardized borrower agreements and to address current industry and regulatory issues pertaining to securities lending."  In fact, the SLA differed from both standard industry agreements.  Among the material differences was a provision which purported to grant immunity to U.S. Bank regarding liability to Woodmen for any damages.

74.     Paragraph 10 of the SLA states as follows:

10. The Bank's Responsibilities.  The Bank's duties and responsibilities shall only be those expressly set forth in this Agreement.  Neither the Bank nor its agents shall be responsible for any loss or liability arising from their performance of the Bank's duties under this agreement, except for direct loss or liability (but not consequential or punitive damages) arising from the Bank's, or its agent's, willful misfeasance, bad faith or gross negligence in the performance of the Bank's duties under this Agreement.  In no event shall the Bank be liable for special, indirect or consequential damages, or lost profits or loss of business, arising under or in connection with this Agreement, even if previously informed of the possibility of such damages and regardless of the form of action.

75.     Paragraph 10 of the SLA is void against public policy and unenforceable under both the laws of the State of Nebraska and the State of Minnesota in that: (1) said clause read literally precludes the recovery of specific damages regardless of the theory of recovery; or , in the alternative (2) is ambiguous in that meaning cannot otherwise be given to all terms therein contained.  As a result, under one or either theory, the clause is unenforceable.

76.     As a result of U.S. Bank's fraudulent misrepresentation of the terms and conditions of the SLA, paragraph 10 is rendered null and void.

77.     Paragraph 10 of the SLA is ambiguous.  Whereas U.S. Bank drafted the SLA, any ambiguity in paragraph 10 must be strictly construed against it.

78.     Paragraph 10 should be stricken from the SLA.

79.     Woodmen is entitled to recover any other equitable relief the Court deems proper.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

80.     Woodmen, for its Second Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

81.     Woodmen and U.S. Bank entered into a written contract, the Security Lending Agreement ("SLA"), as noted above.  Woodmen has performed all conditions precedent required of Woodmen and all obligations of Woodmen under the terms of the SLA, the contract.

82.     U.S. Bank has materially breached the terms of the SLA with Woodmen in one or more of the following particulars:

a.  Pursuant to the terms of the SLA and Offering Memorandum, U.S. Bank was to provide active and expert investment and management of Woodmen's cash collateral.  Instead, U.S. Bank simply 'shopped the ratings' and failed to investigate and/or failed to exercise due diligence when investigating the investments prior to selecting them;

b.  Pursuant to the terms of the SLA and Offering Memorandum, U.S. Bank was to provide active and expert investment and management of Woodmen's cash collateral.  Instead, U.S. Bank failed to oversee, supervise, scrutinize or monitor the merits, prudence and soundness of the investments after their initial purchase;

c.  Pursuant to the SLA and Offering Memorandum, U.S. Bank was to invest Woodmen's assets in short-term bonds.  U.S. Bank unilaterally liquidated and restructured the Securities Lending Portfolio and invested the collateral in another fund and not short term bonds;

d.  Pursuant to the SLA and Offering Memorandum, the investments into which U.S. Bank invested Woodmen's cash collateral were to be liquid and redeemable.  As a result of U.S. Bank's unilateral liquidation and restructuring

20

of the Securities Lending Portfolio, U.S. Bank placed a portion of Woodmen's cash collateral into an illiquid, unredeemable trust which Woodmen cannot access;

e.  Pursuant to the terms of the SLA and Offering Memorandum, U.S. Bank agreed to provide Woodmen with monthly reports setting forth daily information concerning all securities loans outstanding, including an accounting of all securities lending transactions.  Instead, U.S. Bank provided Woodmen with a monthly income statement which failed to include an accounting of all securities lending transactions and which failed to show the value of the Securities Lending Portfolio or how the Portfolio was performing; and the value of any of Woodmen's investments of the cash collateral.

f.  Pursuant to the terms of the SLA and Offering Memorandum, U.S. Bank agreed to serve as Woodmen's fiduciary.  However, U.S. Bank failed to advise Woodmen that the SIVs were experiencing financial difficulties in re-paying the SIV's short-term loans and instead granting the SIVs deferrals without notice to, or the approval of, Woodmen, thus depriving Woodmen of the opportunity to divest Woodmen from the Securities Lending Portfolio prior to the collapse of the SIVs.

83.  Each of the foregoing constitutes a material breach of U.S. Bank's agreement with Woodmen.  As a result of U.S. Bank's breaches, Woodmen has incurred damages in an amount no less than $29.7 million.

84. As a direct and proximate result of U.S. Bank's breach of its contract with Woodmen, Woodmen is entitled to an accounting of all securities lending transactions as well as the disposition of all assets held in the four liquidating trusts.

85. The damages of Woodmen are readily ascertainable and liquidated in amount and Woodmen is therefore allowed prejudgment interest, payable by U.S. Bank, as allowed by law from the notice of the first breach of June 2008 to the present and until judgment is entered in this matter at the prejudgment interest rate as provided under the law.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

86. Woodmen, for its Third Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

87. U.S. Bank owed Woodmen a duty to exercise reasonable care in U.S. Bank's management and oversight of Woodmen's cash collateral.

88. U.S. Bank breached U.S. Bank's duty of care to Woodmen in each of the following manners:

   a.   By failing to exercise due diligence in investigating and vetting the assets backing the commercial paper into which U.S. Bank invested Woodmen's cash collateral;

   b.   By failing to heed the warnings of market analysts and ratings downgrades and continuing to invest in and hold the securities of KKR Atlantic, KKR Pacific, and Ottimo Funding;

c.  By failing to advise Woodmen that the Securities Lending Portfolio was losing value because the SIVs were experiencing financial difficulties in re-paying the SIV's short-term loans and instead granting the SIVs deferrals without notice to, or the approval of, Woodmen, thus depriving Woodmen of the opportunity to divest itself from the Securities Lending Portfolio prior to the collapse of the SIVs;

d.  By intentionally de-valuing the Securities Lending Portfolio to $0.99 per share in the summer of 2008 in order to entice investors in the Securities Lending Portfolio, like Woodmen, to continue holding their investments or risk facing greater losses than would otherwise be warranted by market conditions at the time;

e.  By representing to Woodmen that Woodmen's cash collateral investments were secure at a time when U.S. Bank knew that the SIVs had defaulted in or received a deferral in the payment of principal and/or interest; and

f.  Before June of 2008, in failing to provide Woodmen with any information to allow Woodmen to timely know that the value Woodmen's cash collateral had become significantly reduced, thus depriving Woodmen of the ability to timely withdraw Woodmen's cash collateral funds at a time Woodmen could have attempted to mitigate some of its losses.

89.  As a direct and proximate result of U.S. Bank's negligence and the breach of U.S. Bank's duties to Woodmen, Woodmen has incurred damages in an amount not less than $29.7 million.

90.    As a direct and proximate result of U.S. Bank's negligence and breach of its duties

to Woodmen, Woodmen is entitled to an accounting of all securities lending

transactions as well as the disposition of all assets held in the four liquidating trusts.

91.    The damages of Woodmen are readily ascertainable and liquidated in amount and

Woodmen is therefore allowed prejudgment interest, payable by U.S. Bank, as

allowed by law from the first notice of U.S. Bank's negligence of June 2008 to the

present and until judgment is entered in this matter at the prejudgment interest rate

as provided under the law.

## FOURTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

92.    Woodmen, for its Fourth Cause of Action, specifically re-alleges and reincorporates

the foregoing and preceding paragraphs of this document as if they were fully set

forth herein.

93.    U.S. Bank acted in a fiduciary capacity with respect to Woodmen. A fiduciary must

act with the utmost care, fidelity and good faith to the party holding it in

confidence.

94.    As Woodmen's fiduciary, U.S. Bank was obligated to exercise reasonable care in

U.S. Bank's management and oversight of Woodmen's cash collateral investments

and to act in the best interests of Woodmen.  Such duties included conducting an

independent and thorough investigation into, and continually monitoring, the

merits, prudence and soundness of the investments U.S. Bank made on Woodmen's

behalf.

95.     As Woodmen's fiduciary, U.S. Bank had a duty to ensure that Woodmen's cash

collateral was invested in a manner consistent with the goals and purpose of a

securities lending cash collateral investment program, namely protection of principal and liquidity of investments.

96.    U.S. Bank breached its fiduciary duty of care to Woodmen in one or more of the following particulars:

a.    By failing to investigate and/or exercise due diligence in investigating and vetting the assets backing the commercial paper into which U.S. Bank invested Woodmen's cash collateral;

b.    By failing to continually monitor the merits, prudence and soundness of the investments U.S. Bank made on Woodmen's behalf;

c.    By failing to heed the warnings of market analysts and ratings downgrades and continuing to hold the securities of KKR Atlantic, KKR Pacific, and Ottimo Funding;

d.    By failing to advise Woodmen that the SIVs were experiencing financial difficulties in re-paying the SIVs short-term loans and instead granting the SIVs deferrals without notice to, or the approval of, Woodmen and depriving Woodmen of the opportunity to divest itself from the Securities Lending Portfolio prior to the collapse of the SIVs;

e.    By intentionally de-valuing the Securities Lending Portfolio to $0.99 per share in the summer of 2008 in order to force Woodmen, to continue holding its investments or risk facing greater losses than would otherwise be warranted by market conditions at the time;

f.    By liquidating the Securities Lending Portfolio and transferring a significant portion of the Securities Lending Portfolio's assets to the Prime Fund in

exchange for shares of the Prime Fund. As Woodmen's fiduciary, U.S. Bank owed Woodmen a duty to place the Securities Lending Portfolio assets into an adequately-performing investment. Instead, U.S. Bank placed the assets into the Prime Fund, which U.S. Bank or its agents controlled, without first ascertaining the financial viability of the Prime Fund. Shortly after the Securities Lending Portfolio's assets were transferred to the Prime Fund, the Prime Fund experienced significant losses;

g. By unilaterally liquidating and restructuring the Securities Lending Portfolio in such a manner so that a portion of Woodmen's cash collateral was placed into an illiquid, unredeemable trust;

h. By representing to Woodmen that Woodmen's cash collateral investments were secure at a time when U.S. Bank knew that the SIVs had defaulted in or received a deferral in the payment of principal and/or interest; and

i. Before June of 2008, in failing to provide Woodmen with any information to allow Woodmen to timely know that the value Woodmen's cash collateral had become significantly reduced depriving Woodmen of the ability to timely withdraw Woodmen's cash collateral funds at a time Woodmen could have attempted to mitigate some of the losses.

97. U.S. Bank breached its fiduciary duty of good faith to Woodmen by placing its own interests above those of Woodmen by selecting risky investments which were inconsistent with Woodmen's investments goals, and which exposed Woodmen to unnecessary risk, solely because such riskier investments produced a larger amount of investment income for U.S. Bank;

98.   U.S. Bank breached its fiduciary duty of loyalty to Woodmen by placing its own interests above those of Woodmen by selecting risky investments which were inconsistent with Woodmen's investments goals, and which exposed Woodmen to unnecessary risk, because such riskier investments produced a larger amount of investment income for U.S. Bank;

99.   As a direct and proximate result of U.S. Bank's breach of U.S. Bank's fiduciary duties to Woodmen, Woodmen has incurred damages in an amount not less than $29.7 million.

100.   As a direct and proximate result of U.S. Bank's breach of its fiduciary duties to Woodmen, Woodmen is entitled to an accounting of all securities lending transactions as well as the disposition of all assets held in the four liquidating trusts.

101.   The damages of Woodmen are readily ascertainable and liquidated in amount and Woodmen is therefore allowed prejudgment interest, payable by U.S. Bank, as allowed by law from the first notice of U.S. Bank's breach of U.S. Bank's fiduciary duties to Woodmen of June 2008 to the present and until judgment is entered in this matter at the prejudgment interest rate as provided under the law.

## FIFTH CAUSE OF ACTION
## GROSS NEGLIGENCE

102.   Woodmen, for its Fifth Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

103.   U.S. Bank's negligence and/or breaches of U.S. Bank's statutory, common law and fiduciary duties to Woodmen, as set forth in Woodmen's first two Causes of Action as set out above and as re-stated and incorporated herein by this reference, are so

substantial, egregious, aggravated, and of great magnitude so as to constitute gross negligence.

104.   As a direct and proximate result of U.S. Bank's gross negligence, Woodmen has incurred damages in an amount not less than $29.7 million.

105.   As a direct and proximate result of U.S. Bank's gross negligence and breach of its duties to Woodmen, Woodmen is entitled to an accounting of all securities lending transactions as well as the disposition of all assets held in the four liquidating trusts.

106.   The damages of Woodmen are readily ascertainable and liquidated in amount and Woodmen is therefore allowed prejudgment interest, payable by U.S. Bank, as allowed by law from the first notice of U.S. Bank's gross negligence of June 2008 to the present and until judgment is entered in this matter at the prejudgment interest rate as provided under the law.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

107.   Woodmen, for its Sixth Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

108.   U.S. Bank provided false information for the guidance of Woodmen in its business transactions, which information Woodmen justifiably relied upon, including but not limited to the following:

   a.   That investments of cash collateral were "risk controlled";

   b.   That Securities Lending Portfolio assets would be invested in "high quality, fixed income securities";

    c.  That in March of 2008, U.S. Bank, through its employee or agent Emile Busse, represented to Woodmen that its cash collateral investments were sound even though it knew that one or more of the SIVs had already defaulted on its loan; and,

    d.  That U.S. Bank would 'expertly' and "actively" manage Woodmen's cash collateral investments.

109.  U.S. Bank failed to exercise reasonable care or competence in providing the information U.S. Bank communicated to Woodmen with regard to the quality and value of the cash collateral investments.

110.  As a direct and proximate result of U.S. Bank's negligent misrepresentations to Woodmen, Woodmen has incurred damages in an amount not less than $29.7 million.

111.  As a direct and proximate result of U.S. Bank's negligent misrepresentations to Woodmen, Woodmen is entitled to an accounting of all securities lending transactions as well as the disposition of all assets held in the four liquidating trusts.

112.  The damages of Woodmen are readily ascertainable and liquidated in amount and Woodmen is therefore allowed prejudgment interest, payable by U.S. Bank, as allowed by law from the first notice of U.S. Bank's gross negligence of June 2008 to the present and until judgment is entered in this matter at the prejudgment interest rate as provided under the law.

## SEVENTH CAUSE OF ACTION
## <u>FRAUDULENT MISREPRESENTATION</u>

113.    Woodmen, for its Seventh Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

114.    U.S. Bank made false representations of facts to Woodmen which facts were material and susceptible of knowledge, including:

   a.    U.S. Bank represented to Woodmen that it would actively manage the investments of Woodmen's cash collateral.  However, at the time U.S. Bank made this representation to Woodmen, it had no present intention of managing cash collateral investments after the initial purchase; and

   b.    Emile Busse of U.S. Bank represented to Robert Maher of Woodmen in March 2008 that Woodmen's cash collateral investments were financially sound.  At the time Mr. Busse made theses representations to Mr. Maher, each of the SIVs had experienced at least one default or deferral in payment or principal and/or interest and U.S. Bank had to grant deferrals to stave off further defaults.

115.    U.S. Bank either knew that each of these representations to Woodmen were false or made them without knowing whether they were true or false.

116.    U.S. Bank knew that Woodmen would rely upon these representations when deciding whether to participate in, or to continue participating in, U.S. Bank's securities lending program and U.S. Bank intended to induce Woodmen to act in reliance on these representations.

117.    Woodmen justifiably relied upon U.S. Bank's representations when deciding to join, and later deciding to remain in, U.S. Bank's securities lending program.

118.   As a direct and proximate result of Woodmen's justified reliance on U.S. Bank's false factual representations, Woodmen has suffered damages in an amount no less than $29.7 million.

119.   As a direct and proximate result of U.S. Bank's fraudulent misrepresentations to Woodmen, Woodmen is entitled to an accounting of all securities lending transactions as well as the disposition of all assets held in the four liquidating trusts.

120.   The damages of Woodmen are readily ascertainable and liquidated in amount and Woodmen is therefore allowed prejudgment interest, payable by U.S. Bank, as allowed by law from the first notice of U.S. Bank's fraudulent misrepresentation of June 2008 to the present and until judgment is entered in this matter at the prejudgment interest rate as provided under the law.

## EIGHTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

121.   Woodmen, for its Eighth Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

122.   As Woodmen's fiduciary, U.S. Bank was obligated to disclose all material facts to Woodmen with regard to U.S. Bank's securities lending and cash collateral investment programs.

123.   U.S. Bank deliberately concealed certain material facts from Woodmen, including but not limited to the following:

   a.   That the SIVs were experiencing financial difficulties in re-paying their short-term loans;

b. That the SIVs had either defaulted or requested a deferral from U.S. Bank for principal and/or interest;

c. That U.S. Bank had granted such deferral requests; and

d. That as a result of the SIVs' financial difficulties, the value of the Securities Lending Portfolio, as stated to investors, was grossly overstated

124. U.S. Bank's fraudulent withholding of these material facts was detrimental to Woodmen's interests.

125. As a direct and proximate result of U.S. Bank's deliberate concealment of material facts, Woodmen has incurred damages in an amount no less than $29.7 million.

126. As a direct and proximate result of U.S. Bank's fraudulent concealment, Woodmen is entitled to an accounting of all securities lending transactions as well as the disposition of all assets held in the four liquidating trusts.

127. The damages of Woodmen are readily ascertainable and liquidated in amount and Woodmen is therefore allowed prejudgment interest, payable by U.S. Bank, as allowed by law from the first notice of U.S. Bank's gross negligence of June 2008 to the present and until judgment is entered in this matter at the prejudgment interest rate as provided under the law.

## NINTH CAUSE OF ACTION
## MINNESOTA UNLAWFUL TRADE PRACTICES ACT ("MUTPA")

128. Woodmen, for its Ninth Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

129. Minnesota has adopted the Minnesota Unlawful Trade Practices Act ("MUTPA") codified at Minn. Stat. §§ 325D.09-325D.16.

130. Under the MUTPA it is an unlawful trade practice to "knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

131. For purposes of the MPCFA, "merchandise" includes loans or services such as those provided by U.S. Bank to Woodmen.

132. U.S. Bank knowingly misrepresented the quality of the merchandise U.S. Bank sold to Woodmen, namely U.S. Bank's "active management" and thorough investigation of cash collateral investments by experts. Although U.S. Bank represented that securities lenders' cash collateral would be conservatively invested, U.S. Bank instead invested those funds into subprime and Alt-A mortgages. Afterward, when the SIVs issuing commercial paper backed by these poor assets began to fail, U.S. Bank failed to advise Woodmen of their financial difficulties and instead granting them deferrals without notice to, or the approval of, Woodmen.

133. As a direct and proximate result of U.S. Bank's violation of Minnesota's Unlawful Trade Practices Act, Woodmen has suffered damage in an amount no less than $29.7 million.

134. Woodmen is entitled to recover as part of Woodmen's damages, the costs of its investigation, and Woodmen's attorney's fees.

### TENTH CAUSE OF ACTION
### ACCOUNTING

135. Woodmen, for its Tenth Cause of Action, specifically re-alleges and reincorporates the foregoing and preceding paragraphs of this documents as if they were fully set forth herein.

136. Pursuant to the terms of the documents establishing the Liquidating Trusts, the powers of the Trustee include the power to sell, convey and transfer Trust Assets.

To the extent the Trust has disposed of any Trust Assets, including but not limited to any mortgages or real property, Woodmen is entitled to an accounting of such sales or transfers.

137.   As the entity authorizing the creation of the Liquidating Trusts, U.S. Bank must account for the assets held and/or disposed of by the Trust.

138.   Woodmen is entitled to recover any other equitable relief the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Woodmen of the World Life Insurance Company, prays that judgment be entered in its favor and against U.S. Bank as follows:

A.   On its First Cause of Action:

   (1)   That this Court determine and adjudicate the rights and liabilities of the parties hereto with respect to the Securities Lending Agreement;

   (2)   For declaratory relief in favor of Plaintiff, Woodmen, on the actual controversy between it and Defendant U.S. Bank;

   (3)   That this Court find and declare that Paragraph 10 of the Securities Lending Agreement is void as against public policy;

   (4)   That this Court find and declare that Paragraph 10 of the Securities Lending Agreement is ambiguous and strictly construe it against U.S. Bank and void it;

   (5)   That this Court find and declare that U.S. Bank's fraudulent misrepresentation of the terms and conditions of the SLA render paragraph 10 null and void;

34

(6) That this Court find and declare that U.S. Bank's liability vis-à-vis Woodmen is not limited by the SLA (except to the extent it may be limited by state statutes or common law); and

(7) For such other and further relief as this Court deems just and proper; and

B. On its Second thru Eighth Causes of Action, that judgment be entered in its favor and against U.S. Bank in an amount no less than $29.7 million plus prejudgment interest and costs;

C. On its Ninth Cause of Action:

(1) That judgment be entered in its favor and against U.S. Bank in an amount no less than $29.7 million dollars plus Woodmen's prejudgment interest;

(2) That Woodmen be awarded its costs in investigating this matter;

(3) That Woodmen be awarded its attorney fees in bringing this action; and

(4) For such other equitable relief the Court deems just and proper.

E. On its Tenth Cause of Action:

(1) That the Court order U.S. Bank to account to Woodmen for all securities lending transactions for the period of April 1, 2005, through the date of this action, as well as the disposition of any assets held in the four liquidating trusts; and,

F. Any other relief the Court finds just, legal and/or equitable and proper.

REQUEST FOR JURY TRIAL

Plaintiff requests that all issues triable by jury be so tried in this case.

REQUEST FOR PLACE OF TRIAL

Plaintiff requests that Omaha, Nebraska be designated as place of trial.

DATED this 23rd day of February, 2010.

35

WOODMEN OF THE WORLD LIFE
INSURANCE SOCIETY,
Plaintiff


By:    s/ Patrick G. Vipond & Mark E. Novotny
Patrick G. Vipond, #16390
Mark Novotny, #19102
LAMSON, DUGAN and MURRAY, LLP
10306 Regency Parkway Drive
Omaha, NE 68114
Tel: (402) 397-7300
Fax: (402) 397-7824

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of February, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Matthew B. Reilly
ERICKSON, SEDERSTROM LAW FIRM - OMAHA
10330 Regency Parkway Drive
Suite 100
Omaha, NE 68114
(402) 397-2200
Fax: (402) 390-7137
Email: mreil@eslaw.com

Richard J. Gilloon
ERICKSON, SEDERSTROM LAW FIRM
10330 Regency Parkway Drive
Suite 100
Omaha, NE 68114
(402) 397-2200
Fax: (402) 390-7137
Email: rgill@eslaw.com

Steve W. Gaskins
FLYNN, GASKINS LAW FIRM
333 South 7th Street
Suite 2900
Minneapolis, MN 55402
(612) 333-9500
Fax: (612) 333-9579
Email: sgaskins@flynngaskins.com

Wendy M. Canaday
FLYNN, GASKINS LAW FIRM
333 South 7th Street
Suite 2900
Minneapolis, MN 55402
(612) 333-9500
Fax: (612) 333-9579
Email: wcanaday@flynngaskins.com


s/ Mark E. Novotny_____

472459v2